**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ST. LOUIS COUNTY, MISSOURI, | ) | |
| | ) | |
| Plaintiff, | ) | Cause No. 4:20-CV-655 RLW |
| | ) | |
| v. | ) | |
| | ) | |
| HOUSE OF PAIN GYM SERVICES, LLC, | ) | |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

### PLAINTIFF ST. LOUIS COUNTY, MISSOURI'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AND SUPPLEMENTAL MEMORANDUM IN SUPPORT OF AMENDED MOTION FOR TEMPORARY RESTRAINING ORDER

Defendants House of Pain Gym Services, LLC and F Four, LLC (together, "Defendants") violated the St. Louis County (the "County") Stay-at-Home Order previously in effect and are now openly violating the County's New Guidelines.  Since May 4, 2020, they have opened their gyms to the public for use.  The County notified them that they were, and are, violating the County's public health orders enacted in response to COVID-19.  Defendants ignored the County's notices, accused the County of "tyranny," and continued to operate unlawfully.  This is undisputed.

Defendants are not the first gyms to seek permission from this Court to disregard the County's COVID-19-related public health orders on alleged constitutional grounds.  Not two weeks ago, Judge Clark denied another gym's request for immediate injunctive relief.  *See SH3 Health Consulting, LLC v. Page*, No. 4:20-CV-00605 SRC, 2020 WL 2308444, at *6 (E.D. Mo. May 8, 2020).  Notably, unlike Defendants, that gym complied with the County's public health order while also challenging it.  Defendants, as discussed, have chosen to take a different path. The County seeks immediate injunctive relief to compel Defendants' compliance with the New Guidelines and to protect the community from the increased threat of this deadly virus spreading.

## I.    BACKGROUND

The background regarding the Stay-at-Home Order and the New Guidelines, Defendants'
non-compliance therewith, and the County's repeated notices to Defendants are set forth in detail
in the County's Amended Petition (Complaint) and the County's Amended Motion for TRO.  (*See*
ECF No. 9, ¶¶ 16-38; ECF No. 1-4, pp. 74-78, ¶¶ 7-22.)

Despite their public comments, Defendants have done everything possible to avoid
adjudication of this matter, notwithstanding the incredible waste of public resources and continued
threat to public health and safety along the way.  The County filed this action and a Motion for
TRO on May 11, 2020 in the Circuit Court of St. Louis County, Missouri.  (*See* ECF No. 8.)  The
case was first assigned the next day (presumably due to COVID-19 delays) to Judge Lorne J.
Baker, who recused himself.  The case was then reassigned to Judge John R. Lasater, who promptly
set the County's Motion for TRO for hearing on May 12, 2020.  Approximately ten minutes before
the hearing, Defendants filed an Application for Change of Judge.  *See* MO. SUP. CT. R. 51.05.
The matter was not reassigned until the following day (again, presumably due to COVID-19
delays).  Judge Robert M. Heggie was ultimately assigned the case.  Judge Heggie scheduled a
status conference for May 14, 2020 and the Motion for TRO for hearing on May 15, 2020.
Approximately one hour before the Motion for TRO hearing, the then-sole Defendant, House of
Pain Gym Services, filed a motion to dismiss, contending that this LLC did not actually own the
gyms but instead those assets were held by another LLC.  Defendant evidently possessed an
affidavit to this end on May 12, 2020, but waited to disclose it until immediately before the hearing,
thereby effectively securing another continuance to the following Monday, May 18, 2020.  Shortly
before the Monday hearing, the then-added Defendant F Four attempted to seek another change of
judge, which was denied.  Out of options and facing an adjudication on the merits by the State
Court (which Defendants accused—the entire Twenty-First Judicial Circuit—of bias), Defendants

then removed the case to this Court, immediately after which F Four, its owner (member), Joseph Corbett, and a gym patron commenced duplicative, parallel litigation also before this Court, including attempting to assert claims against County officials in their *individual* capacities.  *See* Case No. 4:20-cv-656 RLW.  The procedural history of this case and Defendants' tactics to date speak volumes about the merits of their arguments, discussed below.

## II.    ARGUMENT

At the outset, the County notes that Defendants' Memorandum is difficult-at-best to decipher.  It spans 49 pages, with the "Background" section spanning approximately 22 pages. Many of the arguments appear to be repeated sporadically throughout the document, most without any legal support.  It also appears that Defendants' Memorandum is also intended to be an Opposition to the County's Motion for TRO, as the final eight pages of the document address the County's entitlement to injunctive relief.  In any case, the County addresses herein what it believes are Defendants' contentions.

**A.    The County's Public Nuisance Ordinance Is Irrelevant in this Case.**

**1.    The County Is Pursuing a Common Law Public Nuisance Claim, Not a Violation of the County Public Nuisance Ordinance.**

Defendants' first argument appears to be that the County somehow cannot pursue a common law public nuisance claim in connection with Defendants' undisputed violation of the New Guidelines because the County has an ordinance that declares certain activities to be public nuisances and that sets forth a procedure for remediating such nuisances under the ordinance. (Memorandum, at 23-28.)  Defendants cite a single case, *City of Independence v. Dewitt*.  In *Dewitt*, the City of Independence sought an injunction based on an alleged public nuisance under the City's ordinances.  550 S.W.2d 840, 841-44 (Mo. Ct. App. 1977).  In concluding that the City

3

was required to comply with its public nuisance ordinance in connection with its allegations of a public nuisance ordinance violation, the court of appeals explained:

> The City contends that it is entitled to an injunction because the alleged violations of the City ordinances made the hotel a public nuisance.  The City cites general statements appearing in several cases indicating that the City has the power to abate public nuisances by injunction.  ***The City does not contend that the property here involved a public nuisance at common law, but states a public nuisance exists because of the violation of City Ordinances. . . .***

*Id.* at 844 (emphasis added).

The County is not contending that Defendants' operation of their gyms is a public nuisance under the County's ordinances.  The County contends that Defendants' operation of their gyms in violation of the New Guidelines constitutes a common law public nuisance.  (*See* ECF No. 9, ¶¶ 40-43.)  *Dewitt* does not hold that the County (or every other unit of local government in the State) has abdicated its right to pursue common law public nuisance claims in court.

On the contrary, Missouri courts have long held that local governments can pursue common law public nuisance claims even when the local government has a public nuisance ordinance.  *See, e.g.*, *City of Sturgeon v. Wabash Railway Co.*, 17 S.W.2d 616, 619 (Mo. Ct. App. 1929) (affirming trial court's grant of injunctive relief to city where the city's petition alleged a public nuisance under both a city ordinance and under common law because the city's petition was "broad enough to support [the finding of public nuisance] even after striking out or treating as surplusage . . . the ordinance"); *see also* 17 McQuillin Mun. Corp. § 49:64 (3d ed.) ("Municipal corporations are entitled to seek vindication of the public's rights by injunction in a court on the same footing as that upon which private persons and corporations may seek redress.  Thus under proper pleadings and proof, and if there is no other adequate remedy, injunctions may be granted in a wide variety of cases. For example, in proper circumstances a city may sue to abate

nuisances, to enforce ordinances, to prevent or minimize damage to the environment, . . . *and* to prevent vexatious litigation and a multiplicity of suits." *Id.* (emphasis added) (footnotes omitted)).

>     **2.**     **The County Has No Adequate Remedy at Law, Including through the County Public Nuisance Ordinance.**

Defendants also contend that the County is not entitled to injunctive relief to enforce the New Guidelines because the County has an adequate remedy at law in the form of the County's public nuisance ordinance.  (Memorandum, at 23-28.)  Simply put, this argument is frivolous.

The County's public nuisance ordinance provides a procedure whereby, as relevant here, the County's Director of Public Works (the "Public Works Director") can send notice to a property owner that a public nuisance, as defined by County ordinance, may exist.  SLCRO § 716.310.2. The property owner has 30 days to remedy the suspected public nuisance.  SLCRO § 716.320.1. If after the expiration of 30 days the Public Works Director believes the public nuisance still exists, the Public Works Director can hold a hearing to determine whether a public nuisance under the ordinance does in fact exist, though 21 days' notice must be given before the hearing.  *Id.*  The Public Works Director's resulting order must be posted on the structure within 72 hours of its issuance.  SLCRO § 716.320.5.  The St. Louis County Police Department cannot begin acting upon or enforcing the order until 30 days after it is posted on the structure.  *Id.*

At the risk of stating the obvious, the County's public nuisance ordinance is not an adequate remedy at law to compel compliance with the County's COVID-19 related public health orders. The County is seeking *immediate* injunctive relief to compel compliance with New Guidelines in order to protect the health and safety of County residents. The object of enforcing the New Guidelines is to help prevent the spread of the deadly and highly communicable COVID-19 virus in the County, which has already been disproportionately impacted compared to the rest of the State. *See SH3 Health Consulting, LLC,* 2020 WL 2308444, at *2 (explaining that as of May 8,

2020, "[t]he City [of St. Louis] and County account for over 55% of the cases [of COVID-19] and over 70% of the total deaths in Missouri").  Proceeding through an administrative process that would not reach a resolution for at least 51 days, with enforcement via the St. Louis County Police Department unavailable for another 30 days thereafter, is plainly not an adequate remedy for the unprecedented, deadly, and dynamic threat presented by the COVID-19 virus

In this regard, the Missouri Court of Appeals' decision in *City of Kansas City v. Mary Don Co.* is apt.  There, the City of Kansas City cited Mary Don Company, which owned various residential, rental properties in Kansas City, for more than 103 ordinance violations, yet Mary Don refused to comply with the ordinances, such that the residential properties because a public nuisance.  606 S.W.2d 411, 413 (Mo. Ct. App. 1980).  The City eventually filed suit, seeking injunctive relief.  *Id.*  Mary Don contended that the City had an adequate remedy of law, *i.e.*, its ordinances, such that injunctive relief was inappropriate.  *Id.* at 413.  The Court of Appeals rejected this argument, explaining:

> **Judicial recognition that courts of equity have jurisdiction to enjoin public nuisances even though the parties maintaining them may also be liable to prosecution under criminal or quasi-criminal statutes or ordinances is rooted in sound logic and common sense.** Under circumstances such as those at hand, it is inherent that the overriding and primary purpose of the relief sought by the City was protection of the health, safety and welfare of the public, and in this frame of reference the fact that such relief might indirectly constitute enforcement of certain quasi-criminal ordinances is merely incidental. The City alleged in its petition that notwithstanding pursuit of its administrative and legal remedies against Mary Don, the latter has failed and refused to abate the rampant conditions existing on the various properties which it owns; moreover, repeated citations of Mary Don had no effect in deterring its persistent, illegal conduct. **Surely the City should not be rendered impotent to seek injunctive relief to protect the health, safety and welfare of its citizenry from ordinance violations when the supporting factual averments also lend themselves to being construed as pleading the maintenance of a public nuisance. Saying that prosecution of Mary Don time and time again and its repeated subjection to the payment of fines is an adequate remedy has a hollow ring when weighed with the public interest. Equity looks to substance rather than form and where, as here, it is pleaded that efforts of the City through administrative and legal channels to eradicate**

6

> **conditions menacing public health, safety and welfare are effectively thwarted, the principal purpose of the City's petition should be broadly viewed as seeking abatement of a public nuisance as opposed to being narrowly viewed as nothing more than an attempt to enforce certain quasi-criminal ordinances.**[1] As disclosed by the City's petition numerous prosecutions and the levying of repeated penalties are highly problematical as effective deterrents to Mary Don's continuing, broad scale, illegal conduct. **So long as Mary Don's conduct persists and the complained of conditions stand unabated, the public, for all practical purposes, remains helplessly victimized.**

*Id.* at 415–16 (emphasis added).  The Court of Appeals thus concluded that the City was permitted to proceed on its claim for injunctive relief.  *Id.* at 416.

As discussed, the result is no different here.  The County sent Defendants repeated notice regarding their non-compliance with the County's public health orders.  Defendants refuse to comply.  Defendants would have this Court render the County impotent to protect its residents from an immediate public health issue of worldwide proportion.  The "sound logic" and "common sense" of Missouri courts preclude this absurd result.  *See also City of Jefferson City, Mo. v. Cingular Wireless, LLC*, 531 F.3d 595, 602-03 (8th Cir. 2008) (city's "tax assessment and collection procedures" were not an adequate remedy at law to determine whether defendant was subject to a tax, and thus city was not required to exhaust them before seeking declaratory relief, because defendant "refused to file the information needed" to make the assessment and assessment procedures  "would require a lengthy and expensive calculation of the tax owed before a legal determination is made whether the defendants are liable").

### 3.    The Primary-Jurisdiction Doctrine Is Inapplicable.

Defendants next argue that the primary-jurisdiction doctrine somehow applies.  It does not.  The Eighth Circuit has cautioned that the primary-jurisdiction doctrine is to be "invoked sparingly, as it often results in added expense and delay." *Alpharma, Inc. v. Pennfield Oil Co.*, 411 F.3d 934, 938 (8th Cir. 2005).  Application of the doctrine "depends on whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application." *Id.*

Those reasons include:  (a) "cases raising issues of fact not within the conventional experience of judges or cases requiring the exercise of administrative discretion;" (b) "enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body;'" and (c) "the promotion of consistency and uniformity within the areas of regulation and the use of agency expertise[.]'"  *Id.*

None of the reasons for application of the primary-jurisdiction doctrine is present here. This Court is fully capable of evaluating whether Defendants' continued operation of their gyms as being open to the public fails to comply with the New Guidelines.  Application of laws, rules, and orders is well within the "conventional experience of judges." *Alpharma*, 411 F.3d at 939; *see also Prater v. Medicredit Inc.*, 45 F. Supp. 3d 1038, 1041–42 (E.D. Mo. 2014) (rejecting application of primary-jurisdiction doctrine because "whether provisions of the TCPA have been violated" is "within the 'conventional experience of [courts]'" (brackets original)).  The County's public nuisance claim does not raise issues outside the "conventional experience of judges" or that require "exercise of administrative discretion."  Defendants do not even attempt to identify any such issues. (*See* Memorandum, at 30-31.)  Further, courts regularly adjudicate public nuisance claims—including such claims asserted by local governments—and, indeed, have been adjudicating public-nuisance claims for more than a century, if not longer. *See, e.g., State ex rel. Schmitt v. Henson*, No. ED 107970, 2020 WL 1862001, at *1, 8 (Mo. Ct. App. Apr. 14, 2020) (trial court did not err in concluding that operation of commercial swimming and diving facility constituted a public nuisance); *City of Lee's Summit v. Browning*, 722 S.W.2d 114, 116 (Mo. Ct. App. 1986) (upholding trial court finding that operation of salvage yard constituted a public nuisance); *Schnitzer v. Excelsior Powder Mfg. Co.,* 160 S.W. 282, 285–87 (Mo. Ct. App. 1912) (affirming trial court's conclusion that storage of high quantities of blasting powder constituted a

public nuisance).  Defendants identify no reason for this Court to abandon that longstanding and fundamental function here.  None exists.

Moreover, adjudication of the County's claims also does not involve resolution of any complex fact issues placed within the competence of an administrative agency having subject-matter expertise.  Defendants do not identify any relevant "expertise and experience" the Public Works Director has in connection with the New Guidance or Missouri public nuisance law, nor do they explain how that would be applied in this case.  (*See* Memorandum, at 30-31.)  This alone is fatal to application of the primary-jurisdiction doctrine. *See United States v. Rice*, 605 F.3d 473, 475-76 (8th Cir. 2010) (primary-jurisdiction doctrine did not apply to garnishment action on restitution order that implicated loans made by the United States Department of Agriculture where defendant had not "identified any issue relating to the garnishment order" that was "suited to the 'expert and specialized knowledge of the [agency]." (brackets original)); *United States v. Henderson*, 416 F.3d 686 (8th Cir. 2005)  (primary-jurisdiction doctrine did not apply in criminal action involving false statements to Social Security Administration because jury was not asked to decide any issues "requiring agency expertise").

Moreover, this is not one of the rare cases requiring uniformity of resolution.  Adjudicating Defendants' violation of the New Guidelines would not jeopardize any existing, uniform regulation.  Defendants have not identified any uniform body of decisions promulgated by the Public Works Director that a ruling from this Court would disrupt.

Finally, an order staying or dismissing this action in lieu of proceedings before the Public Works Director would, as discussed above, result in weeks, if not months, of delay, a result the Eighth Circuit has admonished courts to avoid.  *Alpharma*, 411 F.3d at 938.  The concern for undue

delay is especially prominent here, where continued operation of Defendants' gyms endangers public health and safety.

None of the cases Defendants cite support application of the primary-jurisdiction doctrine. The County's public nuisance claim alleging Defendants' violation of the New Guidelines simply does not involve complex, nationwide issues falling within the scope of any administrative body's unique realm of experience and expertise, like the Federal Communication Commission's "expertise and experience" in the "technical aspects" of "VG 7 service" and "circuit designs, signal transmission, noise attention, and echo return loss[.]" *Cf. Access Telecommunications v. Sw. Bell Tel. Co.*, 137 F.3d 605, 609 (8th Cir. 1998). Likewise, this case does not involve the "special competence" or "expertise and experience with workplace regulation" of the Occupational Safety and Health Commission, in coordination with the United States Department of Agriculture, in interpreting and applying nationwide guidelines and regulations relating to meat-processing plants and COVID-19. *Cf. Rural Community Workers Alliance, et al. v. Smithfield Foods, Inc. et al.*, Case No: 5:20-cv-06063-DGK at *5, 15-16 (W.D. Mo. May 5, 2020). Simply put, the primary-jurisdiction doctrine does not apply.

**B.** **The New Guidelines Do Not Violate Defendants' Due Process or Equal Protection Rights.**

In an argument largely devoid of citation to case law, Defendants next contend that the New Guidelines violate their due process and equal protection rights under the Fourteenth Amendment. Defendants' failure to address the recent opinions of the Eighth Circuit (*In re Rutledge*) and this Court (*SH3 Health Consulting*) is particularly conspicuous, as these decisions articulate and apply the longstanding framework for analyzing constitutional challenges to public health orders such as the New Guidelines. As explained fully below, these cases (among others) demonstrate both that the New Guidelines do not impermissibly burden Defendants' constitutional

rights and that the County is entitled to a TRO enjoining Defendants from operating their gyms in violation of the New Guidelines.

### 1. Defendants' Motion Should Be Denied under the Standard for Evaluating Constitutional Challenges to Governmental Responses to Public Health Crises.

"When considering constitutional challenges to state actions taken in response to a public health crisis, the Court **must** apply the Supreme Court's framework established in *Jacobson v. Massachusetts*, 197 U.S. 11 (1905)."[1] *SH3 Health Consulting*, 2020 WL 2308444, at *6 (emphasis added) (citing *In re Rutledge*, 956 F.3d 1018, 2020 WL 1933122, at *4 (8th Cir. Apr. 22, 2020)). In *Jacobson*, the Supreme Court upheld a mandatory vaccination law in the midst of a smallpox epidemic, explaining that "the liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id.* at 26. During a public health crisis, "a community has the right to protect itself against an epidemic of disease which threatens the safety of its members" and state and local governments may implement measures that infringe on constitutional rights, subject to certain limitations. *Id.* at 27; *see also Prince v. Massachusetts*, 321 U.S. 158, 166-67 (1944) ("The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death."); *United States v. Caltex*, 344 U.S. 149 (1952) (recognizing that "in times of imminent peril—such as when fire threatened a whole community—the sovereign

---

[1] Defendants contend that there "is no pandemic exception to the Constitution." (Memorandum, at 18, 48.) The plaintiff-church in *Legacy Church, Inc. v. Kunkel* made similar arguments, to no avail. No. CIV 20-0327 JB\SCY, 2020 WL 1905586 (D.N.M. Apr. 17, 2020). The court in *Berean Baptist Church v. Cooper* recently used this expression in granting a temporary restraining order in connection with North Carolina's COVID-19 order, which required all worship services involving more than 10 people to be held outdoors "unless impossible." No. 4:20-CV-81-D, 2020 WL 2514313, at *1 (E.D.N.C. May 16, 2020). In any case, hyperbole aside, the Supreme Court, the Eighth Circuit, and this Court have all recognized that a different framework applies when evaluating whether governmental action taken in response to a public health crisis withstands constitutional scrutiny.

could, with immunity, destroy the property of a few that the property of many and the lives of many more could be saved").

As the Eighth Circuit explained in *In re Rutledge*, the *Jacobson* framework for evaluating the constitutionality of state and local government action taken in response to the COVID-19 public health crisis is two-fold: (1) whether the law has no "real or substantial relation" to the protection of the public health, the public morals, or the public safety; and (2) whether the law is, "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." *In re Rutledge*, 2020 WL 1933122, at *4. As Judge Clark recently explained:

> **During a public crisis, a court has no authority to determine the most effective measures for protecting the public – that 'judgment must be left to the governing state authorities."** *In re Abbott*, 954 F.3d [772,] 792 [5th Cir. 2020]. The court's power is limited to asking whether the governing authorities have taken action in 'an arbitrary, unreasonable manner' or through 'arbitrary and oppressive regulations." *Id.* at 784 (quoting *Jacobson*, 197 U.S. at 28, 38). The Court should ask if the measures provide exceptions for extreme cases but should not "second-guess the wisdom or efficacy of the measures." *Id.* at 785.

*SH3 Health Consulting*, 2020 WL 2308444, at *6 (emphasis added); *see also In re Rutledge*, 2020 WL 1933122, at *5 (explaining that "courts may not second-guess the wisdom or efficacy of the measures" taken in a public health crisis); *Smith v. State*, 152 S.W.3d 275, 280 (Mo. banc 2005) (White, C.J., concurring) ("Courts having a proper respect for the constitutional divisions of state power cannot invade the province of another coequal branch of the government." (citation omitted)). The New Guidelines satisfy both aspects of the *Jacobson* framework.

### a. The New Guidelines Have a Real or Substantial Relation to the COVID-19 Public Health Crisis.

First, the New Guidelines have a real and substantial relation to the protection of the public health and safety: they attempt to limit the transmission of COVID-19 through reducing the frequency and proximity of person-to-person contact. *See, e.g.*, *SH3 Health Consulting*, 2020 WL 2308444, at *7 ("The Court finds a real and substantial relation between the [Stay-at-Home Order]

and the health crisis of the COVID-19 pandemic."); *Cross Culture Christian Ctr. v. Newsom*, No.

220CV00832JAMCKD, --- F. Supp. 3d ----, 2020 WL 2121111, at *2 (E.D. Cal. May 5, 2020)

("[B]ans on mass gatherings such as sporting events, concerts, dining rooms, and in-person church

services flow from a larger goal of substantially reducing in-person interactions.").  The New

Guidelines accomplish this in a variety of ways, such as imposing social distancing requirements,

restricting large, intentional gatherings, and as relevant here, prohibiting the operations of certain

high-risk businesses.  *See In re Rutledge*, 2020 WL 1933122, at *5 ("On the record before us, the

State's interest in conserving PPE resources and limiting social contact among patients, healthcare

providers, and other staff is clearly and directly related to public health during this crisis.").  As

Judge Clark recently explained,

> The virus spreads primarily from person-to-person through close contact with one
> another or by touching a surface or object that has the virus and then touching one's
> mouth, nose, or eyes. *Coronavirus Disease 2019 (COVID-19): How it Spreads*,
> https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-
> spreads.html (last visited May 8, 2020). By limiting contact between individuals in
> places of business, the City and County Orders attempt to slow the rate of infection
> and lower the rate of death.

*SH3 Health Consulting*, 2020 WL 2308444, at *7; *accord Calvary Chapel of Bangor v. Mills*, No.

1:20-CV-00156-NT, 2020 WL 2310913, at *7 (D. Me. May 9, 2020); *Gish v. Newsom*, No.

EDCV20755JGBKKX, 2020 WL 1979970, at *5 (C.D. Cal. Apr. 23, 2020).

> **b.     The New Guidelines Are Not, Beyond All Question, a Plain, Palpable
> Invasion of Defendants' Rights Secured by the Fundamental Law.**

Second, the New Guidelines are not a plain, palpable invasion of Defendants' Fourteenth

Amendment rights.  The County has revised its COVID-19-related public health order multiple

times in response to changing circumstances and the scientific understanding of COVID-19, most

recently effective as of May 18 with the New Guidelines.  *See Rutledge*, 2020 WL 1933122, at *6

("Such an expiration date makes the ADH directive a delay, not a ban. . . .").  In short, the County

13

Stay-at-Home Order results in the temporary inability of Defendants to open their gyms to the public for members to exercise.  This restriction is not, "*beyond all question*," a "plain, palpable invasion of rights secured by the fundamental law."  *See Rutledge*, 2020 WL 1933122, at *7-8 (emphasis added).  Indeed, as Judge Clark recognized, "[i]t is not a far reach to say that within the broad limits of the *Jacobson* test, the executive branch may also order businesses to curtail activities to protect the public health and welfare."  *SH3 Health Consulting*, 2020 WL 2308444, at *10.  This ends the constitutional analysis.

> **2.  Even under a Traditional Constitutional Analysis, the Stay-at-Home Order does not violate Defendants' Due Process Rights.**

Though the Court need not engage in this analysis, Defendants' contentions would fail even under a traditional constitutional analysis.  Defendants appear to raise three theories that the New Guidelines violate their due process rights: (1) void for vagueness; (2) lack of procedural due process; and (3) lack of substantive due process.  Under any of these theories, the New Guidelines survive constitutional scrutiny.

> **a.  The New Guidelines Are Not Void for Vagueness.**

Defendants argue that the New Guidelines are inconsistent with state law and regulations and thus fail to give ordinary people fair notice of the conduct they punish and invite arbitrary enforcement.  (Memorandum, at 32 (citing *Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015).)  Defendants never explain how any alleged inconsistency between the New Guidelines and state law renders the language of the New Guidelines vague.  Defendants cite no case to support their argument.

Regardless, there is no inconsistency between the New Guidelines and state law.  Defendants contend that Mo. Rev. Stat. § 192.290 precludes the County and its officials from enacting any regulation that contradicts the rules and regulations of the Missouri Department of

Health and Senior Services ("DHSS").  The County's New Guidelines are not inconsistent with 19 CSR 20-20.050(3), and Mo. Rev. Stat. § 192.290 thus does not preclude their enforcement.  Indeed, the DHSS has confirmed that local governments, like the County, maintain their authority to enact measures more stringent than the State's.  (*See, e.g.,* the DHSS's April 27, 2020 Order ("Nothing herein shall limit the right of local authorities to make such further ordinances, rules, regulations, and orders not inconsistent with this Order which may be necessary for the particular locality under the jurisdiction of such local authorities."); State of Missouri Guidance and Frequently Asked Questions ("Local health authorities may enforce more restrictive public health requirements for businesses or individuals.")[2].).

Defendants also point to 19 CSR 20-20.050(3), which provides that, "in a statewide pandemic, only the director of the Department of Health and Senior Services or the director's designated representative shall have the authority to close a public or private school or other place of public or private assembly." 19 CSR 20-20.050(3).  Under the DHSS's regulations, a "statewide pandemic" is defined as "an outbreak of a particularly dangerous disease affecting a high proportion of the population, appearing in three (3) or more counties, **as declared by the director of the Department of Health and Senior Services**." 19 CSR 20-20.010(37) (emphasis added). The Director of the DHSS has not declared that a statewide pandemic exists in Missouri.  (*See, e.g.*, the DHSS's April 27, 2020 Order[3]; the DHSS's April 16, 2020 Order[4]; the DHSS's April 3,

---

[2]  *Available at*: https://governor.mo.gov/show-me-strong-recovery-plan-guidance-and-frequently-asked-questions (last accessed May 20, 2020).

[3]  *Available at*:  https://governor.mo.gov/sites/gov/files/media/pdf/2020/04/Economic-Reopening-Phase-1.pdf (last accessed May 20, 2020).

[4]  *Available at:*  https://governor.mo.gov/priorities/extension-stay-home-order-covid-19 (last accessed May 20, 2020).

2020 Order.[5])  Defendants do not attempt to show the contrary.  *Ipse dixit* is not a substitute for actual legal and factual argument.  Absent a declaration by the Director of the DHSS of a "statewide pandemic," 19 CSR 20-20.050(3) reserves the power to "close any public or private school or other place of public or private assembly" concurrently in both "the director of the Department of Health and Senior Services or the director's designated representative" *and* "the local health authority"—here, the County and its Department of Public Health.

The County is <u>expressly</u> free to enact restrictions more stringent than in the DHSS's April 27, 2020 Order.  There is no merit to Defendants' argument that the (non-existent) conflict with State law renders the New Guidelines void for vagueness.  *See Givens v. Newsom*, No. 2:20-cv-00852, 2020 WL 2307224, at *9 (E.D. Cal. May 8, 2020) (rejecting a "void for vagueness" argument premised in part on an alleged discrepancy between California's stay-at-home order and a separate public health order).  In fact, the New Guidelines are abundantly clear for gyms and fitness centers: they may not open at this time.

### b.    The New Guidelines Do Not Violate Procedural Due Process Rights.

Defendants next argue that the County has violated their procedural due process rights in preventing them from challenging the designation of gyms as "non-essential."  (Memo. at 34.)  As an initial matter, Defendants' argument is based on a faulty premise: the New Guidelines designate no businesses as either essential or non-essential.  Thus, Defendants have failed to raise an actual controversy under their procedural due process theory.

Assuming for the sake of argument that Defendants have presented a cognizable theory and argument as to how their procedural due process rights were violated, their argument would

---

[5] *Available at*: https://governor.mo.gov/priorities/stay-home-order (last accessed May 20, 2020).

nonetheless fail for two reasons.  First, the Missouri Administrative Procedure Act, Mo. Rev. Stat. §§ 536.010-.150, provides a means of reviewing an administrative order for illegality.  *SH3 Health Consulting*, 2020 WL 2308444, at *9; *see also* Mo. Rev. Stat. § 536.150 (allowing a person to challenge an administrative decision in state court through a suit for injunction, certiorari, mandamus, prohibition, or other appropriate action).  Second, it is a well-established principle of constitutional law that a law of general applicability does not violate an individual's due process rights.  *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 433 (1982); *Neinast v. Bd. of Trustees of Columbus Metro. Library*, 346 F.3d 585, 596–97 (6th Cir. 2003) ("Governmental determinations of a general nature that affect all equally do not give rise to a due process right to be heard."); *Hartman v. Acton*, No. 2:20-CV-1952, 2020 WL 1932896, at *8 (S.D. Ohio Apr. 21, 2020) ("The [COVID-19, stay-at-home order] directing non-essential businesses to cease operating their physical locations did not violate Plaintiffs' due process rights because the [order] was a generally applicable order affecting thousands of businesses, and not a decision targeting an individual or single business.").

Because the New Guidelines are a generally applicable order touching on wide swaths of everyday activities and business, they does not violate Defendants' procedural due process rights.

### c.    The New Guidelines Do Not Violate Substantive Due Process Rights.

Defendants then raise an argument that the County violated their substantive due process rights when, among other things, the County supposedly disregarded its own administrative procedures.  (Memorandum, at 34.)  As explained above, however, Defendants have no basis to assert that the County disregarded any administrative procedures before bringing the instant action. Defendants have otherwise failed to raise any cognizable claim under the theory of substantive due process.  As Judge Clark explained:

> To establish a violation of substantive due process, a plaintiff has to show that "the official's conduct was conscience-shocking, *and* that the official violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed."

*SH3 Health Consulting*, 2020 WL 2308444, at *9.

Here, as in *SH3 Health Consulting*, Defendants have failed to articulate the rights they assert under the Due Process Clause.  The only substantive right that can be gleaned from Defendants' Memorandum is the right to conduct their business.  However, courts in this Circuit consistently reject such due process claims.  *See, e.g.*, *Robbins v. Becker*, 794 F.3d 988, 994 (8th Cir. 2015); *Habhab v. Hon*, 536 F.3d 963, 968 (8th Cir. 2008); *SH3 Health Consulting*, 2020 WL 2308444, at *10.  To the extent Defendants may argue some other substantive right lurking in the shadows of their Memorandum, they have failed to show these rights are fundamental, deeply rooted in our Nation's history, or implicit in the concept of ordered liberty.  In short, Defendants have failed to establish a substantive due process violation.

### 3.    Even under a Traditional Constitutional Analysis, the New Guidelines Do Not Violate Defendants' Equal Protection Rights.

Defendants contend that the New Guidelines violate their Fourteenth Amendment guarantee of equal protection under the law.  (Memorandum, at 35-37.)  Defendants correctly observe that, "[w]hen those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference."  (Memorandum, at 35 (quoting *Engquist v. Ore. Dep't of Agr.*, 553 U.S. 591, 602 (2008)).)  Where the challenged government action does not implicate a fundamental right or suspect class, it "must be upheld against equal protection challenge if there is **any reasonably conceivable state of facts** that could provide a rational basis for the classification."  *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313–14 (1993) (emphasis added).  Under rational basis analysis, the New Guidelines are "not

subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data" particularly where the County "must necessarily engage in a process of line-drawing." *Id.* at 315–16.  As the U.S. Supreme Court further explained:

> [d]efining the class of persons subject to a regulatory requirement—much like classifying governmental beneficiaries—inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact [that] the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration.

*Id.* (second alteration in original) (internal quotation marks omitted).

Here, the County has revised its COVID-19 public health order several times in response to changing circumstances and the scientific understanding of COVID-19.  The County's decision-making has required drawing distinctions between different businesses and public venues based on the risk of spreading COVID-19 associated with each business or venue.  Inevitably, lines must be drawn between entities that may open (within certain guidelines and restrictions) and those that still pose too great of a risk to the public.  Defendants are upset that they fell on one side of that line as opposed to the other.  But the task of drawing that line is for local government, not Defendants or the courts.  *See, e.g.*, *In re Rutledge*, 2020 WL 1933122, at *5; *SH3*, 2020 WL 2308444, at *6; *Smith*, 152 S.W.3d at 280.

Defendants appear to raise three theories regarding how the Equal Protection Clause is implicated by the New Guidelines as applied to them: (1) gyms elsewhere in Missouri, including neighboring counties, are allowed to open; (2) authorized professional sport team training sessions are allowed to occur; (3) retail establishments offering little to no health benefits are allowed to operate.  As explained below, each of these theories lacks merit.

### a.      Gyms Elsewhere in the State

Defendants lament that other gyms in Missouri, including some allegedly just a few miles from Defendants' gyms, are permitted to operate while the New Guidelines preclude Defendants from operating their gyms.  (Memorandum, at 35.)  This is not a valid comparison, as gyms in other counties are not similarly situated to Defendants' gyms, which are located in St. Louis County and are thus subject to County orders.  Gyms located outside the County are, of course, not subject to the County orders.  And even if gyms in Missouri but outside of St. Louis County were somehow similarly situated, there is a valid reason for treating them differently.  COVID-19 is disproportionately prevalent in the County (and in the City of St. Louis): as of May 8, 2020, "[t]he City [of St. Louis] and County account for over 55% of the cases [of COVID-19] and over 70% of the total deaths in Missouri." *SH3 Health Consulting, LLC,* 2020 WL 2308444, at *2.  For this very reason, the Southern District of Florida denied an equal protection claim against that State's "safer-at-home" order, which applied only to four counties in southeast Florida.  *Henry v. DeSantis*, No. 20-cv-80729, 2020 WL 2479447, at *7 (S.D. Fla. May 14, 2020).  Because those four counties accounted for 60% of the State's COVID-19 cases, "[t]he Governor's determination to treat Southeast Florida differently than the rest of the state is, therefore, certainly rationally related to achieving the stated goal."  *Id.*  So too here.

### b.      Professional Sport Teams

Once again, while Defendants make conclusory allegations that professional sport teams will train at facilities similarly situated to Defendants' gyms, they present no evidence in support.  More to the point, though: there is a rational basis for treating these facilities differently.  The facilities of professional sport teams limit access to only team athletes and personnel; these facilities are thus better situated to monitor activity and prevent the spread of COVID-19.  Indeed,

professional sport teams generally have medical professionals on staff and team doctors contracted to care for athletes and minimize the risk of contagion.  Further, as the New Guidelines specify, *members of the public are not allowed to attend practices and training sessions for entertainment purposes*.  (New Guidelines, § III.7.)  Defendants, on the other hand, are admitting members of the public to their gyms.  Keeping gyms like Defendants' closed is rationally related to containing the COVID-19 virus.  That Defendants fall on the other side of the line from professional sport teams is a matter for the political, not judicial sphere.

### c.   Retail Establishments

Defendants point to retail establishments that allegedly offer little or even negative health benefit, which are allowed to remain open under the New Guidelines while Defendants' gyms must remain closed.  (Memorandum, at 36–37.)  The County, however, has a rational basis for treating Defendants' gyms differently.  The risk of spreading COVID-19 is significantly different at a retail establishment, in which people move around quickly and leave, than at a gym or similar closed space where individuals remain (often in close proximity) for an extended period of time, exerting energy, breathing heavily, and sweating.  *See, e.g.*, *Calvary Chapel of Bangor v. Mills*, No. 1:20-cv-00156, 2020 WL 2310913, at *8 (D.Me. May 9, 2020); *Lighthouse Fellowship Church v. Northam*, No. 2:20cv204, 2020 WL 2110416, at *7 (E.D. Va. May 1, 2020); *Gish v. Newsom*, No. EDCV20-755, 2020 WL 1979970, at *6 (C.D. Cal. Apr. 23, 2020).  With the higher risk of spread at a gym as compared to a retail establishment, the New Guidelines' differential treatment is rationally related to the stated goal of containing the effects of the public health crisis in the County.

C.    **The New Guidelines Are a Lawful Exercise of the County's Authority under Missouri Law, Enforceable in Both Incorporated and Unincorporated Areas of the County.**

The New Guidelines are a valid exercise of the County's authority under Article VI, Section 18 of the Missouri Constitution and Mo. Rev. Stat. § 192.300, and thus apply in both unincorporated and incorporated areas of the County, where Defendants' gyms are located.

"St. Louis County is a home rule charter county."  *State ex rel. St. Louis Cty. v. Campbell*, 498 S.W.2d 833, 836 (Mo. Ct. App. 1973).  The police power of the State of Missouri is "delegated to charter counties by the state pursuant to article VI, section 18(c)" of the Missouri Constitution as a governmental function.  *Pepper v. St. Charles Cty., Missouri*, 517 S.W.3d 590, 596 (Mo. Ct. App. 2017).  Pursuant to its police power, and other constitutionally delegated powers, a charter county "may provide for the vesting and exercise of legislative power pertaining to any and all services and functions of any municipality or political subdivision, except school districts, throughout the entire county within as well as outside incorporated municipalities."  Mo. Const., Art. VI, § 18. "Generally, the function of the police power has been held to promote the health, welfare, and safety of the people by regulating all threats either to the comfort, safety, and welfare of the populace or harmful to the public interest." *Craig v. City of Macon,* 543 S.W.2d 772, 774 (Mo. banc 1976).  A charter county thus possesses an implied grant of power "for the exercise of all powers and duties of counties and county officers prescribed by the constitution and laws of the state." *See Hellman v. St. Louis Cnty.,* 302 S.W.2d 911, 915 (Mo. 1957).  This power is limited only if "a charter or ordinance enacted under [section] 18(b) . . . invade[s] the province of general legislation involving the ***public policy of the state as a whole***." *Flower Valley Shopping Ctr., Inc. v. St. Louis Cnty.,* 528 S.W.2d 749, 754 (Mo. banc 1975) (internal quotation marks omitted) (emphasis added).  Accordingly, when a county is addressing a matter of a local concern, the

charter supersedes state law. *State ex rel. St. Louis Cnty. v. Campbell,* 498 S.W.2d 833, 836 (Mo. Ct. App. 1973).

In addition, under Article VI, Section 18(b) of the Missouri Constitution, "[t]he charter shall provide for," among other things, "the exercise of all powers and duties of counties and county officers prescribed by the constitution and laws of the state[.]"  As required by Section 18(b), the St. Louis County Charter provides that "the council shall have, by ordinance, the power to . . . [e]xercise all powers and duties now or hereafter conferred upon counties, county courts, county governing bodies and county officers by the constitution, by law and by this charter and determine and make provision for any matter *of* county government not otherwise provided herein[.]"  (County Charter, ECF No.1-4, at p. 7, § 2.180.14.) The State confers on county commissions and health center boards, by statute, the power to make and promulgate orders, ordinances, rules or regulations "to enhance public health and prevent the entrance of infectious, contagious, communicable or dangerous disease into" their respective counties. *See* Mo. Rev. Stat. § 192.300.1.[6] Orders, ordinances, rules, and regulations authorized by this section are "enforceable" County-wide, "against vendors in both unincorporated and incorporated St. Louis County." *See Avanti Petroleum, Inc. v. St. Louis Cty.*, 974 S.W.2d 506, 509 (Mo. Ct. App. 1998). An order, ordinance, rule, or regulation is authorized under Mo. Rev. Stat. § 192.300 if it "bears a reasonable relation to public health enhancement and disease prevention." *Id.*

The County thus enjoys broad authority to protect the public health of County residents. *See* Mo. Const. Art. VI, § 18; Mo. Rev. Stat. § 192.300.  Under Section 4.130 of the St. Louis

---

[6] Those orders, ordinances, rules, or regulations may not "[b]e in conflict with any rules or regulations authorized and made by the department of health and senior services in accordance with this chapter or by the department of social services under chapter 198." *See* Mo. Rev. Stat. § 192.300.1(1). As explained above, the New Guidelines are not inconsistent with the DHSS's Order.  They are instead exactly consistent with them.

County Charter and Section 600.010 SLCRO, Dr. Doucette has been delegated authority to act on St. Louis County's behalf for public health purposes, including those described in Mo. Rev. Stat. § 192.300 regarding the issuance of orders to enhance the public health and prevent the entrance of infectious, contagious, communicable, or dangerous diseases.  The County Charter expressly vests the County Director of Public Health with "the powers and duties conferred upon deputy state health commissioners and county health officers by law and such other powers and duties as may be required by ordinance."  (County Charter, ECF No. 1-4, at p. 13, § 4.130.)  That section further provides that: "The director shall have the power, without limiting the foregoing general powers, to," among other things, "*[s]ee that laws and ordinances relating to public health are observed and enforced*" and "*[e]stablish and maintain such activities and clinics as are needed to promote the public health of the county*."  (*Id.*, § 4.130.5-.6 (emphasis added).)  This power has been adopted by St. Louis County Ordinance No. 602.020.  (ECF No. 1-2, at p. 17.)

The New Guidelines are a valid exercise of the County's and Dr. Doucette's authority under Missouri and County law to protect the public health and welfare against the unique and dynamic threats that COVID-19 poses to the County and its residents.  The New Guidelines, without question, bear a clear and explicit relation to public health enhancement and disease prevention in the County, and are thus a valid exercise of the County's authority under Article VI, Section 18(b) of the Missouri Constitution and Mo. Rev. Stat. § 192.300, among other sources of authority.  As such, the New Guidelines are enforceable in both unincorporated and incorporated areas of the County, including in the City of Chesterfield and the City of Maryland Heights where Defendants' gyms are located. *See Avanti Petroleum*, 974 S.W.2d at 509 (an ordinance "preventing sales of tobacco to minors to reduce or prevent their use of such products" bore a "reasonable relation to reducing dangerous disease" and was thus "authorized and enforceable against vendors

24

in both unincorporated and incorporated St. Louis County."); *see also Readey v. St. Louis Cty. Water Co.*, 352 S.W.2d 622, 627 (Mo. 1961) (upholding an ordinance adding fluoride to County water as reasonably related to public health because it was designed to decrease tooth decay, a widespread and serious disease); *Professional Houndsmen of Missouri, Inc. v. County of Boone*, 836 S.W.2d 17, 19 (Mo. Ct. App. 1992) (ordinance imposing requirements on animal owners enhanced public health "by preventing rabies and animal bites" and was "reasonably related to the purpose of public health enhancement and disease prevention"); *Borron v. Farrenkopf*, 5 S.W.3d 618, 622 (Mo. Ct. App. 1999) (ordinance regulating animal feeding operations "rationally related to the purpose of public health enhancement and disease prevention" because of link between human diseases and livestock animal waste).

Nothing Defendants cite in their Memorandum holds otherwise.  Defendants do not explain how the statute addressing the establishment of local emergency management organizations, Mo. Rev. Stat. § 44.080, could somehow limit the County's authority to protect the health and safety of County residents under Article VI, § 18 of the Missouri Constitution and Mo. Rev. Stat. § 192.300, as explained above. Defendants cite no authority for this unfounded proposition either. Finally, Defendants' apparent argument that a scrivener's error in the background section of the New Guidelines, referring to § 19**3**.300 instead of § 19**2**.300, when describing Dr. Doucette's authority somehow precludes their enforcement, is simply frivolous. (*See* Memorandum, at 39-40.)  The Authorization section of the New Guidelines correctly identifies § 192.300.  (*See* New Guidelines, § VII).  As explained above, the New Guidelines are a clear and valid exercise of the County's constitutional and statutory authority, vested in Dr. Doucette pursuant to the County Charter and Ordinances, to protect the health and safety of its residents.  No apparent scrivener's error in the background section of the New Guidelines can undo that.

**D.**     **The County Is Entitled to Immediate Injunctive Relief.**

"To determine whether a temporary restraining order is warranted, the Court considers four factors: '1) the threat of irreparable harm to the moving party; 2) the state of the balance between the harm to the moving party and the harm that granting the injunction will inflict on the other parties; 3) the probability that the moving party will succeed on the merits; and 4) the public interest.'"   *City of Berkeley, Missouri v. Ferguson-Florissant Sch. Dist.*, No. 4:19CV168 RLW, 2019 WL 1558487, at *2 (E.D. Mo. Apr. 10, 2019) (quoting *Arthur J. Gallagher Risk Mgmt. Servs., Inc. v. Kinsey*, No. 4:08 CV 635 DDN, 2008 WL 2064797, at *1 (E.D. Mo. May 14, 2008) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)).   Each factor weighs in favor of granting the County's requested TRO.

   **1.     Likelihood of Success on the Merits**

As discussed above, there is no dispute that Defendants are operating their gyms in violation of the New Guidelines.  The New Guidelines are a public health order designed to attempt to limit the spread of COVID-19 in the community.  Defendants' continued operation in violation of the New Guidelines and the resulting increased risk of spread of COVID-19 in the community constitutes an unreasonable interference with community rights, including public health, safety, and welfare; constitutes an unreasonable and unlawful use of Defendants' property and businesses, causing an injury to and endangering the community; and has a profound and serious impact on the health, safety and welfare of the people in St. Louis County, Missouri, the State of Missouri, and the greater United States.   As also discussed above, Defendants' challenges to the enforceability of the New Guidelines fail.  The County is likely to succeed on the merits of its common law public nuisance claim.

2.      **Balance of Harms and Public Interest**[7]

Defendants essentially ask the Court to lift public health restrictions enacted to attempt to curtail the spread of COVID-19 because "[i]t is simply not possible to eliminate [the] risk" of COVID-19 spreading and because if some businesses are open then all businesses must be open. (Memorandum, at 44, 47.)   Defendants' specious arguments notwithstanding, this Court has already twice held that the balance of harms and public interest weigh in favor of enforcing COVID-19-related public health orders.  As Judge Pitlyk recently recognized, it cannot be said "that a temporary restraining order prohibiting the [local government] from taking the steps it reasonably deems necessary to slow the spread of Covid-19 serves the public interest."  *Frank v. City of St. Louis*, Case No. 4:20-CV-00597 SEP, --- F. Supp. 3d ----, 2020 WL 2116392, at *5 (E.D. Mo. May 2, 2020).  As Judge Pitlyk explained further:

> The City's interest in this case is the effective containment of the Covid-19 virus and the protection of public health.  Thus, the Court's analysis of the third and fourth [temporary restraining order] factors converge.  **There can be little doubt that the public interest heavily favors the city's ability to take steps to prevent the spread of this deadly disease.**  As the Eighth Circuit recently observed, the world "is in the midst of an unprecedented health crisis occasioned by the worldwide COVID-19 pandemic.  Every day, the number of people infected with COVID-19 continues to rise, along with the virus's death toll."

*Id.* (emphasis added) (quoting *In re Rutledge*, 2020 WL 1933122, at *1).  Judge Clark followed suit in *SH3 Health Consulting*:

> The final two factors for a TRO [potential for harm and the public interest] weigh in favor of denial.  As the Court very recently stated in *Frank v. City of St. Louis*, "there can be little doubt that the public interest heavily favors the city's ability to take steps to prevent the spread of this deadly disease."  **The concerns of Plaintiffs,**

---

[7] The balance of harms and public interest factors merge when the government is a party. *See, e.g.*, *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) ("When the government is a party, these last two factors merge." (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  In any case, the balance of harms and public interest factors weigh in favor of granting the requested injunctive relief for the same reasons.

> **in conducting their businesses, do not outweigh the severe harm the residents of the City and County could suffer if the Court overrode the Orders. Government authorities must have the ability to maintain public health and safety in times of great crises such as these.**

*SH3 Health Consulting*, 2020 WL 2308444, at *11 (emphasis added) (internal citations omitted);

*see also Tolle v. Northam*, No. 1:20-CV-363 LMB/MSN, 2020 WL 1955281, at *1-2 (E.D. Va. Apr. 8, 2020) ("Although the Court recognizes plaintiff's constitutional concerns, those concerns do not outweigh the severe harm defendants would suffer if they could not enforce the Executive Order. Moreover, it is no exaggeration to recognize that the stakes for residents of the Commonwealth are life-or-death.").

Simply put, the balance of the harms and public interest weigh in favor of enforcing the County's COVID-19-related public health order.

### 3.     Threat of Irreparable Harm

Defendants contend that no irreparable harm would flow from their violation of the New Guidelines because Defendants believe that they take adequate steps to combat the transmission of COVID-19 in their gyms.  (Memorandum, at 42-44.)  In issuing the New Guidelines, Dr. Doucette concluded that certain businesses encourage types of congregations that carry "a very high risk of transmission of COVID-19."  (New Guidelines, § III.7.)  These types of business are governed mostly by common sense: "entertainment, conference and sporting venues (regardless of square footage); gyms and fitness centers; banquet rooms; bars and businesses that primarily serve alcohol and do not serve full meals are limited to curbside and pickup service; indoor and outdoor pools except those located at an individual's residence; sporting events; sports courts; and playgrounds."  (*Id.*)

Defendants' belief that by taking steps they deem sufficient no irreparable harm will result from their non-compliance with the New Guidelines misses the mark entirely.[8]  Dr. Doucette is the Director of the Department of Public Health.  The New Guidelines logically identify categories of businesses where the risk of transmitting COVID-19 is too high to permit the businesses to operate as normal.  *See, e.g.*, *Frank v. City of St. Louis*, 2020 WL 2116392, at *4 (explaining, regarding irreparable harm, that "[t]he Court is hesitant to use its equitable powers to second-guess the reasonable and informed decisions of public health experts"); *see also SH3 Health Consulting*, 2020 WL 2308444, at *6 ("During a public crisis, a court has no authority to determine the most effective measures for protecting the public – that 'judgment must be left to the governing state authorities." (internal quotation marks and citation omitted)).  Defendants' operation of their gyms in contravention of the New Guidelines causes irreparable harm to the County and its residents for which injunctive relief is necessary and appropriate.

## III.    CONCLUSION

The County is in the midst of a public health crisis.  The New Guidelines are a public health order designed to attempt to curtail the spread of the deadly COVID-19 virus.  Defendants are refusing to comply with the New Guidelines.  This Court has already denied a gym owner's attempt to avoid enforcement of the County's public health orders.  The same result is appropriate here.

---

[8] Defendants' citation to *Valentine v. Collier* is curious.  (Memorandum, at 21.)   In *Valentine*, the Fifth Circuit granted a motion to stay a preliminary injunction entered by the district court requiring the Texas Department of Criminal Justice to implement various cleaning and safety measures *beyond* those recommended by the Centers for Disease Control and Prevention and beyond those already adopted by the Department.  956 F.3d 797 (5th Cir. 2020).  Conversely, in this case, Defendants seek to strip away public health protections.

Respectfully submitted,

**BETH ORWICK
COUNTY COUNSELOR**

Dated: May 20, 2020                    By:     /s/    Steven J. Capizzi
                                               Steven J. Capizzi, #56209 (MO)
                                               Emily B. Allison, #67304 (MO)
                                               Associate County Counselor
                                               41 S. Central Avenue, Ninth Floor
                                               Clayton, MO  63105
                                               (314) 615-7042 (tel); (314) 615-3732 (fax)
                                               scapizzi@stlouisco.com
                                               eallison@stlouisco.com

                                               and

                                               **LEWIS RICE LLC**

                                               Neal F. Perryman, #43057 (MO)
                                               Michael L. Jente, #62980 (MO)
                                               600 Washington Avenue, Suite 2500
                                               St. Louis, Missouri 63101
                                               Telephone: (314) 444-7661
                                               Facsimile:  (314) 612-7661
                                               nperryman@lewisrice.com
                                               mjente@lewisrice.com

                                               *Attorneys for Plaintiff*
                                               *St. Louis County, Missouri*

30