**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION**

| | |
|---|---|
| ST. LOUIS COUNTY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 4:20-cv-00655-RLW |
| ) | |
| HOUSE OF PAIN GYM SERVICES, ) | |
| LLC, F FOUR, LLC, d/b/a "House of ) | |
| Pain Gym" and "House of Pain", ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS**

COMES NOW fraudulently and pretensively joined Defendant, House of Pain Gym Services, LLC, and Defendant F Four, LLC, d/b/a "House of Pain Gym" and d/b/a "House of Pain", by and through their undersigned counsel and, pursuant to leave granted by the Court on May 20, 2020 (ECF No. 32), submit herewith Defendants' Reply in Support of Their Motion to Dismiss (ECF No. 19).

## I. INTRODUCTION

In its Opposition to Defendants' Motion to Dismiss (ECF No. 27) and during its argument before the Court on May 20, 2020, the County made repeated references to recent cases wherein other judges have had occasion to analyze other constitutional challenges brought by other business owners to certain of the County's prior stay-at-home orders. (*See, e.g.,* ECF No. 27, p. 1, referring to *SH3 Health Consulting, LLC, v. Page,* No. 4:20-cv-00605-SRC, 2020 WL 2308444 (E.D. Mo., May 8, 2020). Those cases are inapposite here. The County stay-at-home orders at issue in those cases were not the same one that is in effect now. The prior County stay-at-home orders were issued in connection with the Missouri Governor's statewide stay-at-home order which was

1

effective April 6, 2020 through May 3, 2020. As applied to gyms, the prior County stay-at-home orders appear to have been consistent with the controlling state orders in force at the time. At least as applied to gyms, that is no longer the case, however.

The only local government health authority order in play at this time, and the one at issue in this case, is the local order issued on May 8, 2020 by Dr. Emily Doucette, Acting Director (the "County Director") of the St. Louis County Department of Public Health (the "County Order"). That County Order was issued after the April 27, 2020 order by the Director (the "State Director") of the Missouri Department of Health and Human Services implementing Phase One of the Governor's State of Missouri "Show Me Strong Recovery Plan" (the "State Order"). The State Order went into effect for the entire State of Missouri on May 4, 2020. The County Order adopts and incorporates the State Order and "all restrictions therein…" It also "replaces" and "rescinds" the County's prior stay-at-home orders. In other words, all of the County's prior stay-at-home orders are a legal nullity at this point.

As discussed in Defendants' Memorandum in Support of Their Motion to Dismiss (ECF No. 20), the State Order adopted by reference the President's "Opening America Up Again Guidelines" (the "Presidential Guidelines"), which Presidential Guidelines specifically permit gyms to be open if they adhere to strict physical distancing guidelines and sanitation protocols. The Governor has made it clear that the State Order applies to "ALL Missouri businesses…" and that even "[b]usinesses that were considered "non-essential" by the federal government may resume operations in Missouri in accordance with the Order and these guidelines." *(See,* (https://governor.mo.gov/show-me-strong-recovery-plan-guidance-and-frequently-asked-questions (last checked May 21, 2020) (Emphasis in original).

In accordance with Mo.Rev.Stat. §190.300, the State Order allows county health authorities to promulgate orders, rules or regulations as will tend to enhance the public health and prevent the entrance of infectious, contagious, communicable or dangerous diseases into their counties. However, as set forth in §190.300.1(2), any such local health authority orders **shall not be in conflict with any rules or regulations authorized by the department of health and senior services** (Id., emphasis added). Pursuant to Mo.Rev.Stat. §192.290, orders issued by the State Director supersede, as to the matters addressed therein, all local ordinances, rules and regulations and local health authorities are expressly prohibited from making further ordinances, rules and regulations that are **inconsistent with** any order issued by the State Director on the same matter. Defendants in this case do not dispute, as a general proposition, that the appropriate local health officials have authority to issue orders with respect to a matter addressed in a related order issued by the State Director, but the local health authority can only do so if the local order is **consistent with** the applicable state order. In other words, since the State Order conferred upon gyms the right to re-open so long as they operate with the proper social distancing and sanitation procedures in place, local health authorities cannot issue a blanket order taking that permission away. That is clearly **inconsistent with** the right conferred upon gym owners by the State Order.

F Four, LLC ("F Four") (the real party in interest and the only Defendant properly joined in this case) and its owner, are not by this action taking the position that local government officials have no authority to reasonably regulate public health and safety. It is the manner in which that authority has been exercised in this particular instance that F Four challenges.

In the exercise of its police power, even where it has broad authority to regulate public health and safety, the executive branch of our government is constrained by the Constitution and statutes which place limits on that power. Under the facts and circumstances at issue in this case,

3

F Four contends the County's elected and appointed officials, however well-meaning initially, have exceeded those limits on their authority – at least as applied to gyms, their owners and members.

## II. ARGUMENT

### A. The Court can and should exercise the power of the judiciary to ask whether the County has taken the actions at issue in an arbitrary, unreasonable manner, or through arbitrary and oppressive regulations.

The County suggests that the Court should take a hands-off approach and simply defer to the County's decision to order gyms in general (with the exception of the similar facilities used by professional athletes and professional sport teams), and F Four's gyms in particular, to close.

Initially, it appeared courts around the country dealing with challenges to various state and local stay-at-home orders were inclined to take such a hands-off approach and decline to weigh-in on them, instead deferring to the political branches to deal with the COVID-19 pandemic. However, as we have seen with more and more recent orders striking down similar stay-at-home orders in other states (Wisconsin and Oregon, for example) on grounds similar to those at issue in this case, there appears to be an emerging shift in that initial trend.

The County relies heavily on *Jacobson v. Massachusetts,* 197 U.S. 11 (1905) as authority for its suggestion that the Court should not get involved here. But a careful reading of *Jacobson* actually suggests that this is precisely the sort of dispute that requires judicial oversight. Indeed, *Jacobson* instructs that the courts *do* have the power to examine whether the governing authorities have taken action in "an arbitrary, unreasonable manner" or through "arbitrary and oppressive regulations." Id. at 28, 38. "In *Railroad Company* v. *Husen*, 95 U.S. 465, 471-473, this court recognized the right of a State to pass sanitary laws, laws for the protection of life, liberty, health or property within its limits, laws to prevent persons and animals suffering under contagious or

4

infectious diseases, or convicts, from coming within its borders. But as the laws there involved when beyond the necessity of the case and under the guise of exerting a police power invaded the domain of Federal authority and violated rights secured by the Constitution, this court deemed it to be its duty to hold such laws invalid." Id.

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." *Marbury v. Madison,* 5 U.S. 137, 163 (1803). "The question whether a right has vested or not, is, in its nature, judicial, and must be tried by the judicial authority." Id. at 167. Since *Marbury v. Madison* it has always been settled law in this country that any law repugnant to the Constitution is void (Id. at 177) and that it is the proper role and function of the courts to exercise the judicial power to keep the other branches from exceeding their constitutional authority.

This case cries out for judicial oversight because there are serious due process and equal protection issues created by the County's conduct. It was the County that ignored its own public nuisance ordinance, and the administrative procedures set forth therein, and brought this case before the courts in the first place - not the Defendants.

**B.  At least as applied to gyms, the County Order is arbitrary, unreasonable and unnecessarily oppressive.**

The County Order's blanket order that gyms must close (except for professional athletes and professional sport teams) is objectively arbitrary, unreasonable, and unnecessarily oppressive both on its face and in its application. The County has not alleged or argued a single *fact* to support its vague and speculative conclusory allegation that gyms like F Four's (operating with the same social distancing, sanitation and other precautionary measures the County allows other businesses to operate under) actually present any greater risk of COVID-19 from person to person than that

5

which is present everywhere else in the community in general or in the many other businesses the County is allowing to stay open. Indeed, many of the businesses the County has permitted to open attract much larger groups of people and are far less sanitary than these gyms. The numerous social distancing, health screening, sanitization, and safety protocols in force at F Four's gyms were discussed in detail during the hearing before this Court on May 20, 2020 and in Defendants' Memorandum of Law in Support of Their Motion to Dismiss (ECF No. 20, pp. 9-10).

Essentially, the County's argument is that "we're the government, we have the authority to say gyms must close, we don't have to give any factual support for our assertion that they are high-risk, and you have to do what we say because we say so and we have broad police power." But, the County has not alleged or argued a single *fact* – not one – to actually support its claim that the gyms are in any way actually higher risk than any of the other businesses it has allowed to open. That is the very definition of arbitrary and unreasonable.

When those who appear similarly situated are nevertheless treated differently, the Equal Protection Clause requires at least a rational reason for the difference, to ensure that all persons subject to legislation or regulation are indeed being 'treated alike, under like circumstances and conditions.'" *Engquist v. Ore. Dep't of Agr.,* 553 U.S. 591, 602 (2008). "A statute or ordinance which vests arbitrary discretion with respect to an ordinarily lawful business, profession, appliance, etc., in public officials, without prescribing a uniform rule of action, or in other words, which authorizes the issuing or withholding of licenses, permits, approvals, etc., according as the designated officials arbitrarily choose, without reference to all of the class to which the statute or ordinance under consideration was intended to apply, and without being controlled or guided by any definite rule or specified conditions to which all similarly situated might knowingly conform,

in unconstitutional and void." *State ex rel. Triangle Fuel Co. v. Caulfield,* 196 S.W.2d 296, 298 (Mo. 1946).

During the hearing before this Court on May 20, 2020, the Court asked the County how the gyms are any riskier than the other businesses the County has allowed to open. The only difference offered by the County was a reference to people "sweating" and touching things in the gyms. But, Dr. Anthony Fauci, widely regarded as one of the leading infectious disease officials in the United States, has repeatedly said the virus is not transmitted through sweat. (*See, e.g.,* https://www.abc.net.au/news/2020-05-12/dr-fauci-breaks-down-how-coronavirus-could-affect-contact-sports/12237244 - last checked May 21, 2020) (""Sweat as such won't transmit it...").

Moreover, the U.S. Centers for Disease Control and Prevention now informs us that the virus is, in fact, <u>not easily spread from touching surfaces</u> or <u>objects</u>. (*See,* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html - last checked May 21, 2020) ("**The virus does not spread easily in other ways…From touching surfaces or objects.** It may be possible that a person can get COVID-19 by touching a surface or object that has the virus on it and then touching their own mouth, nose, or possibly their eyes. **This is not thought to be the main way the virus spreads**, but we are still learning more about this virus.") (Emphasis added).

The County Order, as applied to the broad closure of gyms generally, and F Four's gyms specifically, has no real or substantial relation to the protection of public health, the public morals, or the public safety and it is, beyond all question, as the County seeks to apply it selectively and unequally to gyms (as compared to other businesses it is allowing to be open), a plain, palpable invasion of rights secured by the Fourteenth Amendment's Equal Protection Clause. Therefore, applying the rationale of *In re Rutledge,* 956 F.3d 1018, 2020 WL 1933122 (8th Cir. Apr. 22, 2020)

7

and the *Jacobson* framework, the challenged local government action in this case (again, at least as applied to the blanket closure of gyms announced in the County Order, inconsistent with the controlling State Order), does not pass even a basic common sense level of scrutiny, let alone any heightened measure of constitutional scrutiny.

Because the gyms at issue are employing all of the same social distancing, sanitization and other reasonable safety measures as are being used by the other businesses the County is allowing to open, there is no rational basis whatsoever for the County ordering the gyms closed while allowing the other businesses to remain open. This completely arbitrary and oppressive discrimination of like persons (allegedly) subject to the County Order is not controlled or guided by any definite rule or specified conditions to which all similarly situated might knowingly conform. As applied to the blanket order that gyms (except for the aforementioned professional athletes and sport team's facilities), the County Order is thus unconstitutional and void. *See, e.g., State ex rel. Triangle Fuel Co.,* 196 S.W.2d at 298; *Engquist*, 553 U.S. at 602.

### C. The County has failed to plead any facts sufficient to state a claim for public nuisance upon which the injunctive relief sought can be granted.

At common law, a public nuisance is an **unreasonable** interference with common community rights, such as public health, safety, peace, morals, or convenience. *See, e.g., Lee's Summit v. Browning,* 722 S.W.2d 114 (Mo.App.1986); *Baker v. Empire Dist. Elec. Co.,* 24 S.W.3d 255, 264 (Mo.App.2000). A local ordinance can be used to define the type of conduct that constitutes a nuisance. *See, e.g., Davis v. J.C. Nichols Co.,* 714 S.W.2d 679 (Mo.App.1986), 761 S.W.2d 735 (Mo.App.1988). In this case, the County has chosen "public nuisance" as its cause of action. It alleges that the continued operation of the gyms at the properties in issue "…is an unreasonable and unlawful use of [the gym properties], causing an injury to and endangering the community." (ECF No. 9, ¶41). It alleges that the continued operation of the gyms at the properties

in issue "…has a profound and serious impact on the health, safety and welfare of the people in St. Louis County, Missouri, the State of Missouri, and the greater United States." (ECF No. 9, ¶42). It alleges that the continued operation of the gyms at the properties in issue "…constitutes a public nuisance." (ECF No. 9, ¶43).

The County does have an ordinance that defines public nuisance, SLCRO §716.300. That ordinance closely tracks the allegations of the Complaint here. Uses of property deemed to constitute a public nuisance under the County's ordinance include "in violation of law, maintaining or permitting a condition or engaging in an activity which unreasonably annoys, injures or endangers the safety, health, morals or repose of any inhabitant of St. Louis County…any other condition or activity…which is detrimental to the safety, welfare or convenience of the inhabitants of St. Louis County." SLCRO §716.300.1(i), (k).

In this case, the County has not stated, and cannot state, a claim upon which the Court can grant the extraordinary and drastic remedies the County seeks. This is so because the County has not met, and cannot meet, its burden of pleading and proving that F Four's use of its properties to operate the gyms, after accounting for the protective measures it has implemented (i.e., social distancing, sanitization, etc.), constitutes an unreasonable or actually unlawful use of the properties. Moreover, the County has not pled or argued a single fact that meets its burden to show any actual injury to anybody, or any actual threat to the safety, health, or safety of the community that is in any way greater than the risk of COVID-19 transmission from person to person that already exists in the community generally, or in the other business environments the County is allowing to remain open.

As per Dr. Fauci's good counsel referenced above, people sweating inside the buildings cannot reasonably be said to constitute a threat to the safety, health or safety of the community. As

9

per the CDC's guidance referenced above, people touching things (which are constantly being cleaned and sanitized) inside the buildings – the same conduct people engage in at every store and other business the County is allowing to open – cannot reasonably be said to constitute a threat to the safety, health or safety of the community. So, what then, is it the County claims is so comparatively dangerous about these gyms? The answer is nothing. There is not a single factual allegation supporting any such position to be found anywhere in the Complaint, its supporting attachments, the police officer's affidavit filed with it, in counsel's argument to the Court on May 20, 2020, or in the County Order itself.

Again, the Eighth Circuit has held that "[m]erely demonstrating the 'possibility of harm' is not enough." *Chlorine Inst., Inc. v. Soo Line R.R.,* 792 F.3d 903, 915 (8th Cir. 2012). ("Speculative harm does not support a preliminary injunction."). In the context of the COVID-19 pandemic and the issues germane to this case, the Court must fairly consider the vague, speculative, threat alleged by the County after "accounting for the [COVID-19] protective measures" the gyms have already implemented which are all of the currently recommended safety precautions and then some. *See, e.g., Valentine v. Collier,* 2020 U.S. App. LEXIS 12941, *8 (5th Cir. Apr. 22, 2020) (i.e., denying injunctive relief sought in a prisoner's rights case and discussing reasonable COVID-19 protective measures, including: access to soap and handwashing, tissues, gloves, masks; regular cleaning and disinfecting of common areas and surfaces, including common-use items such as television controls, books and **gym and sports equipment**; signage and education; social distancing, use of alcohol-based hand sanitizers; masks, etc.).

> D. **The County's failure to exhaust its administrative remedies, including the specific procedures created by its own public nuisance ordinance, preclude it from seeking injunctive relief.**

Defendants maintain that *City of Independence v. DeWitt*, 550 S.W.2d 840 (Mo.App.1977) is the controlling legal authority on this point. Under Missouri law, the local government entity may not resort to a court of equity for an injunction when, as in this case, it has adopted a detailed method to deal with an allegedly dangerous property absent *pleading* and *proof* to show such procedure was followed to no avail and, as such, the government has no adequate remedy at law. Id. at 845; *see also, City of Kansas City v. Mary Don Co.,* 606 S.W.2d 411 (Mo.Ct.App.1980) discussed below. On the other hand, the County asserts that it has the option of ignoring the detailed administrative procedures its own public nuisance ordinance and instead seeking the extraordinary and drastic remedies it asks this Court to impose on F Four.

As authority for that proposition, the County relies heavily on *City of Kansas City v. Mary Don Co.,* 606 S.W.2d 411 (Mo.Ct.App.1980). (*See,* ECF No. 27, ¶¶ 6-7). There was some discussion during the May 20, 2020 hearing about that case, and why it is clearly distinguishable from the case at bar. In a nutshell, in the County's Response in Opposition to Defendants' Motion to Dismiss (ECF No. 27) and during the hearing, when discussing the *Mary Don* case, the County missed a rather important point.

The Court of Appeals in *Mary Don* noted that: "This case is factually distinguishable from the case of City of Independence v. Dewitt, 550 S.W.2d 840 (Mo.App.1977), in that here the City pleaded and proved that it had pursued its administrative and legal remedies to no avail and the underlying facts pleaded as constituting ordinance violations, when liberally construed, may also be deemed to plead the maintenance of a public nuisance." Id. at 416, n.1.

As in this case, in *Mary Don,* the City of Kansas City had a detailed public nuisance ordinance addressing, among other things, conditions or uses of property that the City believed to be injurious to the health, safety, convenience, comfort, morals, prosperity, and general welfare of

11

the public. Its public nuisance ordinances included, as in the present case, detailed substantive and procedural safeguards pertaining to declaration and abatement of nuisances, notice requirements and hearings. *See,* Id. at 413.

In the *Mary Don* case, before filing suit and seeking relief from the court in equity, the City of Kansas City actually followed its public nuisance ordinances, and complained of more than 103 violations, all to no avail. Id., *see also, City of Union v. Julius,* 706 S.W.2d 513, 515 (Mo.App.E.D. 1986) (city was allowed to proceed with a common law public nuisance claim seeking injunctive relief because its nuisance ordinance addressed only high grass and weeds, but did not encompass storage boxes, wooden items, out-buildings, metal objects and vehicle the city claimed to constitute a public nuisance).  Discussing *Mary Don,* the court in *Julius* noted that in *Mary Don* the defendant failed to abate the violations after notice and a hearing. Id. at 514-15.  It went on to explain that "The Western District Court distinguished *Mary Don* from *City of Independence v. DeWitt…*in two respects: 1) in *Mary Don* the City pleaded that it had pursued its administrative and legal remedies to no avail and 2) in *Mary Don* the underlying facts pleaded as ordinance violations may also be deemed to plead the maintenance of a public nuisance…In *DeWitt* there was no showing of a proceeding to enforce legal remedies." Id.

By contrast, in the present case, the County has not pleaded and proved – because it cannot do so – that it made any effort to follow the procedural and substantive due process protections clearly spelled out in its own ordinance. The County argues here that it would be expensive and inconvenient to require that it do so and the immediate threat of irreparable harm (which, as discussed above, is not supported by any factual allegations or support whatsoever) is simply so great that the County should be excused from having to exhaust the administrative remedies set forth in its own ordinances.

The County also cites *City of Sturgeon v. Wabash Railway Co.,* 17 S.W.2d 616, 619 (Mo.Ct.App. 1929) in support of its position that it can ignore the administrative process codified in its public nuisance ordinance and elect to proceed with an action in equity to seek injunctive and other relief. But, upon a careful reading of that case, it is also inapposite. The Court in *Wabash* noted that "[b]y the weight of authority a municipality may, ***at least in the absence of any other or special remedy available to it***, maintain a suit to enjoin or abate a nuisance which affects matters that have been confided to it as a governmental agency, even though it suffers no such special damage as is necessary to sustain a suit on the theory of a private nuisance." Id. (citations omitted) (Emphasis added).

This case is clearly distinguishable from *Wabash* in that here the County *does* have another remedy available to it – it can and should go through the administrative procedure codified in its own public nuisance ordinance. That public nuisance ordinance creates a detailed process which, if followed, should provide property owners accused of public nuisance violations some basic procedural and substantive due process (i.e., specific notice, a right to a contested hearing before the person the County has designated by its own ordinance as the subject matter expert qualified to hear and determine based on the evidence and testimony presented whether a particular use of a particular property in fact constitutes a threat to the safety, health or safety of the community, and the ability to appeal from an adverse finding to a court). If the County is allowed to avoid that administrative procedure for the government's convenience and in the interest of expediency, the ordinance and its due process protections are essentially meaningless.

Mo.Rev.Stat. §536.150.1 contemplates exactly this sort of exhaustion of administrative remedies as a precedent to coming to a court of equity for relief. That statute sets forth as follows:

> When any administrative officer or body existing under the constitution or by statute or by municipal charter or ordinance shall have rendered a decision which

13

is not subject to administrative review, determining the legal rights, duties or privileges of any person, including the denial or revocation of a license, and there is no other provision for judicial inquiry into or review of such decision, such decision may be reviewed by suit for injunction, certiorari, mandamus, prohibition or other appropriate action, and in any such review proceeding the court may determine the facts relevant to the question whether such person at the time of such decision was subject to such legal duty, or had such right, or was entitled to such privilege, and may hear such evidence on such question as may be properly adduced, and the court may determine whether such decision, in view of the facts as they appear to the court, is unconstitutional, unlawful, unreasonable, arbitrary, or capricious or involves an abuse of discretion; and the court shall render judgment accordingly, and may order the administrative officer or body to take such further action as it may be proper to require; but the court shall not substitute its discretion for discretion legally vested in such administrative officer or body, and in cases where the granting or withholding of a privilege is committed by law to the sole discretion of such administrative officer or body, such discretion lawfully exercised shall not be disturbed.

The County chose to allege public nuisance as its cause of action in this case. That was not the Defendants' choice. In so doing, the County committed itself to a requirement that it exhaust its administrative remedies, and provide the substantive and procedural due process, codified in its own ordinances specifically dealing with alleged use of properties in St. Louis County which the County believes constitute a public nuisance. As in *DeWitt,* its failure to exhaust the administrative procedure the County Council adopted by specific ordinance means it cannot obtain injunctive relief. As illustrated by *DeWitt, Mary Don,* and *Julius,* before the government can proceed to seek injunctive relief based on a common law public nuisance claim, it must first comply with its administrative process and, only after doing so to no avail, may it seek injunctive relief.

**E.  The County's demand for an order compelling F Four to turn over to the government the names and contact information of every person who has been in the gyms violates the Fourth Amendment and should be rejected.**

The Fourth Amendment to the United States Constitution provides that: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by

14

oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const. Amend. IV). The demand by the County that the Court should compel F Four to turn over its client list is on its face offensive to the Fourth Amendment. Moreover, the County has threatened to criminally prosecute people who allegedly violate the County Order. None of the individuals at issue should have to submit to a warrantless search or seizure or any COVID-19 test against their will without a warrant that complies with the rigorous requirements of the Fourth Amendment. Moreover, on the very same day the County filed this lawsuit seeking this relief and damages for the cost of COVID-19 testing of the individuals who have been in the gyms at any time since they opened to the public, County Executive Sam Page, at a press conference had the following exchange with a reporter: Q: "Are key people in the county such as yourself being tested on a regular basis?" A: "We don't test anyone who doesn't have a reason to be tested - isn't symptomatic. We follow all the social distancing guidelines and, you know, there's no reason to test members of my staff." Q. "You yourself have not been tested?" A. "No."

Under the circumstances, the requested relief not only violates the Fourth Amendment, but it is also patently unreasonable and indicative of the County's bad faith and animus in trying to harm F Four's business in order to punish it for challenging the County Order. This abusive conduct should not be rewarded.

### III. <u>CONCLUSION</u>

For the foregoing reasons and those set forth in Defendants' Memorandum of Law in Support of Their Motion to Dismiss (ECF No. 20), improperly joined Defendant House of Pain Gym Services, LLC and F Four, LLC, pray this honorable Court should dismiss deny Plaintiff's prayer for injunctive relief, and dismiss the Complaint.

## VERIFICATION OF SIGNED ORIGINAL DOCUMENT

Pursuant to Local Rule 11-2.11, W. Christopher McDonough, hereby attests to the existence of a paper copy of this document bearing the original signature of W. Christopher McDonough. The document was electronically filed on May 21, 2020. Counsel will retain the paper copy bearing the original signatures during the pendency of the litigation including all possible appeals.

Respectfully submitted,

THE McDONOUGH LAW FIRM, LLC

By: */s/ W. Christopher McDonough*
W. Christopher McDonough # 49648MO
16640 Chesterfield Grove Road, Suite 125
Chesterfield, MO 63005
(636) 530-1815 - Telephone
(636) 530-1816 - Facsimile
E-mail: wcm@mcdlawfirm.net
*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing has filed with the Court for service on all counsel of record via the Court's ECF system on May 21, 2020.

*/s/ W. Christopher McDonough*